## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MICHAEL RUBIN, on Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> NEUSTAR, INC., LISA A. HOOK, JAMES G. CULLEN, PAUL D. BALLEW, JOEL P. FRIEDMAN, MARK N. GREENE, ROSS K. IRELAND, PAUL A. LACOUTURE, DEBORAH D. RIEMAN, MICHAEL J. ROWNY, and HELLENE S. RUNTAGH, <br><br> Defendants. | Case No. _____ <br><br> JURY TRIAL DEMANDED <br><br> CLASS ACTION |

### COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Plaintiff Michael Rubin, by and through his undersigned counsel, for his complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of his counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.     This is a class action brought on behalf of the public stockholders of Neustar, Inc. ("Neustar" or the "Company") against Neustar and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9 and to enjoin the vote on a proposed transaction, pursuant to which Neustar will be acquired by Golden Gate Private Equity, Inc., a private investment group led by Golden Gate Capital and GIC Special Investments Pte. Ltd. (collectively, "Golden Gate"), through their

newly formed entities, Aerial Topco, L.P. ("Parent") and Parent's wholly-owned subsidiary Aerial Merger Sub, Inc. ("Merger Sub") (the "Proposed Transaction").

2.      On December 14, 2016, Neustar issued a press release announcing that it had entered into an Agreement and Plan of Merger (the "Merger Agreement") to sell Neustar to Golden Gate.   Under the terms of the Merger Agreement, Golden Gate will acquire all outstanding shares of Neustar for $33.50 in cash (the "Merger Consideration").

3.      On January 17, 2017, Neustar filed a Preliminary Proxy Statement on Schedule 14A (the "Proxy") with the U.S. Securities and Exchange Commission ("SEC").   The Proxy, which recommends that Neustar stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) Neustar management's projections, utilized by the Company's financial advisor, J.P. Morgan Securities, LLC ("J.P. Morgan"), in its financial analyses; (ii) the valuation analyses performed by J.P. Morgan in connection with the rendering of its fairness opinion; and (iii) the background of the Proposed Transaction.   The failure to adequately disclose such material information constitutes a violation of the above-referenced sections of the Exchange Act as stockholders need such information in order to cast a fully-informed vote in connection with the Proposed Transaction.

4.      In short, the Proposed Transaction will unlawfully divest Neustar's public stockholders of the Company's valuable assets without fully disclosing all material information concerning the Proposed Transaction to Company stockholders.   To remedy defendants' Exchange Act violations, Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such problems are remedied.

**JURISDICTION AND VENUE**

5.      This Court has jurisdiction over the claims asserted herein for violations of

Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

6.      This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391 as well as under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because a substantial portion of the actionable conduct took place in this District.

## PARTIES

8.      Plaintiff is, and has been continuously throughout all times relevant hereto, a continuous stockholder of Neustar.

9.      Defendant Neustar is a Delaware corporation with its principal executive office located at 21575 Ridgetop Circle, Sterling, Virginia 20166.  Neustar's common stock is traded on the New York Stock Exchange under the ticker symbol "NSR."

10.      Defendant  Lisa A. Hook ("Hook") has been President of the Company since January 2008, Chief Executive Officer ("CEO") of the Company since October 2010, and a director of the Company since November 2010.

11.      Defendant James G. Cullen ("Cullen") has been Chairman of the Board since 2010 and a director of the Company since 2005.

12.      Defendant Paul D. Ballew ("Ballew") has been a director of the Company since July 2015.

13.     Defendant Joel P. Friedman ("Friedman") has been a director of the Company since 2006.

14.     Defendant Mark N. Greene ("Greene") has been a director of the Company since April 2012.

15.     Defendant Ross K. Ireland ("Ireland") has been a director of the Company since 2006.

16.     Defendant Paul A. Lacouture ("Lacouture") has been a director of the Company since 2007.

17.     Defendant Deborah D. Rieman ("Rieman") has been a director of the Company since July 2015.

18.     Defendant Michael J. Rowny ("Rowny") has been a director of the Company since 2006.

19.     Defendant Hellene S. Runtagh ("Runtagh") has been a director of the Company since 2006.

20.     Defendants Hook, Cullen, Ballew, Friedman, Greene, Ireland, Lacouture, Rieman, Rowny, and Runtagh are collectively referred to herein as the "Board" or the "Individual Defendants."

## OTHER RELEVANT ENTITIES

21.     Golden Gate Capital is private equity firm with over $15 billion of capital under management and is headquartered in San Francisco.

22.     Golden Gate Private Equity, Inc. is a private equity group led by Golden Gate Capital.

23.     GIC Special Investments Pte. Ltd. is a sovereign wealth fund established by the

Government of Singapore in 1981.

24.     Parent is a Delaware limited partnership formed by Golden Gate.

25.     Merger Sub is a Delaware corporation and wholly-owned subsidiary of Parent.

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Neustar common stock (the "Class").  Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

27.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

28.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of December 12, 2016, there were approximately 54,757,172 shares of Neustar Class A common stock issued and outstanding and 1,864 shares of Class B common stock issued and outstanding. All members of the Class may be identified from records maintained by Neustar or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

29.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

        (a)     Whether defendants violated Section 14(a) of the Exchange Act and Rule
                14a-9 promulgated thereunder;

        (b)     Whether the Individual Defendants have violated Section 20(a) of the
                Exchange Act; and

        (c)      Whether Plaintiff and the other members of the Class would suffer irreparable harm were the Proposed Transaction consummated.

30.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in litigation of this nature.

31.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

32.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### Company Background and Strong Financial Outlook

33.     Neustar is a technology company and global real-time information services provider.  The Company was founded in 1996 and started as a business unit within Lockheed Martin Corporation.  Today, Neustar is the Local Number Portability Administrator ("LNPA"), and administers the largest Local Number Portability registry in the world, which facilitates the routing of over 4 billion calls and enables over 1 million transactions every day.  Neustar is the only provider of such services under seven regional contracts between the Company and the North American Portability Management, LLC (referred to in the Proxy as the "NPAC Contract").

34.     The Company also provides chief marketing officers a comprehensive suite of services to plan their media spend, identify and locate desired customers, invest effectively in marketing campaigns, deliver relevant offers, and measure the performance of these activities.

Additionally, security professionals use the Company's solutions to maximize web performance and protect against malicious attacks.

35.     The Company's recent financial results underscore its promising prospects.   On April 28, 2016, Neustar issued a press release announcing its financial results for the first quarter of 2016.   The Company reported revenue of $287.3 million for the quarter, compared to $251.4 million in the first quarter of 2014, representing a 14% increase.   Revenue from Marketing Services revenue increased 55% to $57.7 million compared to the first quarter of 2015, revenue from Security Services increased 23% to $48.6 million compared to the first quarter of 2015, revenue from  Data Services increased 10% to $53.2 million compared to the first quarter of 2015, and revenue from NPAC Service increased 1% to $127.8 million compared to the first quarter of 2015.   Defendant Hook commented on the favorable results, stating:

> Once again, our Information Services delivered strong organic revenue growth, led by 25% in Marketing Services and 10% in Security Services. And after owning MarketShare for a full quarter, we are even more confident in the strategic fit of this acquisition[.] It is clear that the combination of our teams, powerful analytics and unique authoritative identity framework positions us favorably to capitalize on tremendous opportunities and drive shareholder value. The power of the combination is demonstrated by recent customer wins such as Audi UK, Deutsche Telecom and Angie's List. Long-term prospects remain strong.

36.     On July 28, 2016, Neustar issued a press release reporting its financial results for the second quarter of 2016.   Revenue increased 16% to $297.6 million, compared to $256.8 million in the second quarter of 2015.   Revenue from Marketing Services increased 56% to $63.9 million compared to the second quarter of 2015, and revenue from Security Services increased 22% to $49.3 million compared to the second quarter of 2015.   Adjusted EBITDA also increased 12% to $131.4 million compared to the second quarter of 2015, and adjusted net income increased 12% to $69.4 million or $1.26 per share, compared to the second quarter of 2015.   Commenting on the Company's improved financial results, defendant Hook noted:

During the second quarter, we delivered strong financial results and improved our growth prospects in attractive markets by entering into key strategic partnerships with companies that include Limelight Networks and Experian. Through these partnerships, we have created the world's largest and most distributed DDoS mitigation network, and we have established a best-in-class marketing solution to target and deliver audience data in an omni-channel environment[.] We are focused on expanding our differentiated position in these markets, and delivering on our 2016 objectives.

37.     On October 27, 2016, Neustar announced its financial results for the third quarter of 2016.  Revenue again increased 15% to $300.1 million.  Revenue from Marketing Services increased 54% to $63.3 million compared to the third quarter of 2015, and revenue from Security Services increased 18% to $51.0 million compared to the third quarter of 2015.  Net income also increased to $53.0 million or $0.96 per share, a 5% increase from the third quarter of 2015.  Adjusted EBITDA increased 6% to $134.5 million, and adjusted net income increased 67% to $121.0 million or $2.18 per share, compared to the third quarter of 2015.  Defendant Hook commented on the quarter's results:

Over the past several years we have made significant progress in transforming Neustar, having built market-leading solutions to serve rapidly-growing markets. We are receiving external validation of the quality of our solutions from industry heavyweights such as Forrester, which recognized us as a 'Leader' in its Marketing Measurement and Optimization Solutions Wave report[.]

***The Sale Process***

38.     On June 20, 2016, the Company engaged J.P. Morgan as its financial advisor and the next day, the Company announced its intention to separate Neustar into two independent, publicly-traded companies.  Following the public announcement, Neustar and J.P. Morgan received inquiries from six financial sponsors (referred to in the Proxy as Parties A, C, D, E, F, and G) and one strategic acquirer (referred to in the Proxy as Party B).

39.     In early July 2016, Parties A, B, and C had discussions with J.P. Morgan, resulting in those parties becoming a group (referred to in the Proxy as Group ABC).  Group

ABC subsequently sent an indication of interest to Neustar with respect to a potential sale transaction, which did not include a proposed price or price range, but did indicate that the consideration would be a combination of cash and a contingent value right ("CVR") with respect to the NPAC contract for a period of up to three years following the closing.

40.     On July 20, 2016, Party D sent an indication of interest to the Company, which did not include a proposed price.

41.     On July 22, 2016, defendant Hook and Senior Vice President and Chief Financial Officer Paul S. Lalljie ("Lalljie") met with Group ABC in Washington, D.C. and presented an overview of the Company.

42.     On July 26, 2016, Neustar received an indication of interest from Party E, which did not include a proposed price.

43.     At an August 17, 2016 Board meeting, the board formed a special committee (referred to in the Proxy as the "Transaction Committee"), comprised of defendants Cullen, Friedman, Greene and Lacouture.

44.     On August 26, 2016, J.P. Morgan sent Group ABC, Party D and Party E an instruction letter requesting that preliminary offers be submitted by September 14, 2016.

45.     The next day, a member of the public equity arm of Golden Gate contacted defendant Hook indicating that Golden Gate was acquiring an equity position in Neustar.

46.     In early September 2016, each of Party F and Party G indicated interest in a potential sale transaction.

47.     On September 14, 2016, Group ABC submitted a preliminary, non-binding proposal to acquire the Company for $25.00 per share in cash payable at the closing and a CVR representing the right to receive a pro rata portion of the after-tax free cash flow generated by the

NPAC Contract, net of any restructuring costs.

48.     On September 15, 2016, Party D submitted a preliminary, non-binding proposal to acquire the Company at a per share price in the range of $31.00 to $32.50 payable in cash upon the closing of the transaction.  Also on September 15, 2016, Party E informed J.P. Morgan that it would not be submitting a proposal because it was unlikely to achieve its required return.

49.     On September 22, 2016, Golden Gate contacted J.P. Morgan to assess Neustar's interest in a potential sale transaction with Golden Gate.

50.     In late September 2016, defendant Hook and Lalljie met with each of Party F, Party G and Golden Gate to, among other things, present an overview of the Company.

51.     On October 6, 2016, Party G informed J.P. Morgan it would not be submitting a proposal because it was unlikely to achieve its required return.

52.     The next day, Party F submitted a preliminary, non-binding proposal to acquire the Company at a range of $29.00 to $30.00 per share in cash.  Party F also indicated it was unlikely to increase its price and, following a Transaction Committee meeting with management, J.P. Morgan informed Party F it was not invited into the second round of the price based on its $29.00 to $30.00 price range.

53.     On October 19, 2016, Golden Gate submitted a preliminary, non-binding proposal to acquire the Company for $33.50 per share in cash payable upon the closing of the transaction.

54.     On October 26, 2016, J.P. Morgan sent an instruction letter to Group ABC, Party D and Golden Gate requesting that proposals for a definitive offer be submitted by November 28, 2016.

55.     On November 7, 2016, Party C informed J.P. Morgan it would not continue to participate in the process as part of Group ABC due to lack of sufficient resources.

56.     On November 9, 2016, J.P. Morgan provided a letter to the Board regarding potential conflicts of interest with Party A, Party B, Party D and Golden Gate. The letter indicated that J.P. Morgan and its affiliates had provided corporate finance, treasury and/or asset management services to each such party and/or its affiliates during the prior two years, including portfolio companies of Golden Gate.

57.     On November 14, 2016, Party D informed J.P. Morgan it was no longer interested in continuing discussions.

58.     On November 29, 2016, Party A submitted a non-binding proposal to acquire the Company for $27.50 per share in cash payable at the closing and a CVR representing the right to receive a pro rata portion of the future net distributable cash flows generated by the NPAC business.  Potential payments under the CVR would start on October 1, 2018 and continue for a period of up to four years following the closing.  Party A estimated that the CVR could deliver additional value of up to $9.00 per share.  The proposal also indicated that to the extend Party B were to participate, it would be a minority investor.

59.     On the same day, Golden Gate submitted a non-binding proposal to acquire the Company for $32.75 per share in cash, $0.75 per share lower than its October 19th proposal.

60.     On November 30, 2016, after the Board requested Golden Gate's best and final offer, Golden Gate submitted a proposal of $33.50 per share in cash.

61.     Following a December 1, 2016 Board meeting, the Board concluded that the value of the CVR in Party A's proposal was significantly less than the $9.00 per share Party A indicated and therefore, the Board determined to continue negotiations with Golden Gate on a non-exclusive basis and informed Party A that it was not willing to engage in a transaction on Party A's proposed terms.

62.     On December 2, 2016, Party A submitted a revised proposal to acquire the Company for $28.50 per share in cash payable at the closing and a CVR with equivalent terms to those outlined in Party A's November 29th proposal.  After discussions with J.P. Morgan, the Board informed Party A that the revised proposal remained unacceptable.

63.     On December 8, 2016, Party A submitted a further revised proposal to acquire the Company for $29.50 per share in cash payable at the closing and a CVR with equivalent terms to those outlined in Party A's November 29th proposal, except for an extension of the maturity date for the CVR from four years to five years following the closing.  Following discussions with J.P. Morgan, the Board again informed party A that its further revised proposal remained unacceptable.

64.     On December 13, 2016, J.P. Morgan delivered its fairness opinion to the Board and the Board determined that the terms of the Merger Agreement were acceptable.

65.     On December 14, 2016, prior to the opening of the U.S. stock markets, the parties executed the Merger Agreement.  That same day, the 30-day go-shop period began, ending on January 13, 2017.  J.P. Morgan contacted 43 parties, 19 potential strategic buyers and 24 financial sponsors.  Four parties entered into confidentiality agreements, but the Proxy fails to disclose whether any of those parties are subject to standstill provisions.  None of Parties A through G participated in the go-shop process and, as of the date of the Proxy, Neustar has not received any alternative acquisition proposals.

**The Materially Incomplete and Misleading Proxy**

66.     On January 13, 2017, defendants filed the materially incomplete and misleading Proxy with the SEC and disseminated it to Neustar's stockholders.  The Proxy fails to disclose material information stockholders need in order to make a fully informed voting decision with

respect to the Proposed Transaction, including, as discussed below, material information concerning (i) Neustar management's projections, utilized by the Company's financial advisor, J.P. Morgan, in its financial analyses; (ii) the valuation analyses performed by J.P. Morgan in connection with the rendering of its fairness opinion; and (iii) the sale process leading up to the Proposed Transaction.

### Materially Incomplete and Misleading Disclosures Concerning Neustar's <u>Projections</u>

67.    The Proxy omits material information regarding Neustar management's financial projections.  Specifically, with respect to the Company's financial projections for fiscal years 2016-2025, the Proxy fails to disclose the following: (i) net income; (ii) interest; (iii) taxes; (iv) depreciation and amortization; (v) stock-based compensation; (vi) restructuring costs for all years; (vii) standalone costs for all years; (viii) capital expenditures; (ix) changes in working capital; and (x) a reconciliation of GAAP to non-GAAP metrics.

68.    The omission of this information renders the following statements in the Proxy false and/or materially misleading in contravention of the Exchange Act:

(a)    From pages 43-44 of the Proxy:

**Projected Financial Information**

* * *

Neustar uses financial information that has not been prepared in accordance with GAAP, including adjusted EBITDA. We use these non-GAAP financial measures in analyzing our financial results and believe that they enhance investors' understanding of our financial performance and the comparability of our results to prior periods, as well as against the performance of other companies. Non-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information prepared in accordance with GAAP. Neustar's calculation of non-GAAP financial measures may differ from others in its industry and adjusted EBITDA is not necessarily comparable with similar titles used by other companies.

13

The following is a summary of management's financial projections for fiscal years 2016 through 2021, plus extrapolations of such estimates for fiscal years 2022 through 2025 (dollars in millions):

| | Management Projections[1] | | | | | | Extrapolations | | | |
| | 2016E | 2017E | 2018E[2] | 2019E | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | $1,216 | $1,304 | $1,263 | $953 | $1,020 | $1,093 | $1,158 | $1,211 | $1,251 | $1,276 |
| Adjusted EBITDA[3] | $547 | $585 | $496 | $306 | $337 | $381 | $403 | $422 | $436 | $445 |
| Unlevered Free Cash Flow[4] | — | $179 [5] | $353 | $152 | $182 | $195 | $206 | $216 | $223 | $227 |

(1)     Except for the projections of estimated revenue and adjusted EBITDA for fiscal year 2016, the financial projections are as of September 25, 2016. Our senior management subsequently updated the estimated revenue of $1,219 million and adjusted EBITDA of $558 million included in the September 25th projections to the amounts set forth in this table.

(2)     Assumes that Neustar does not provide any services or transition services under the NPAC Contract after September 30, 2018.

(3)     Adjusted EBITDA (non-GAAP) means net income before interest, taxes, depreciation and amortization and is presented before the impact of stock-based compensation, restructuring costs and standalone costs.

(4)     Unlevered free cash flow (non-GAAP) means earnings before interest and taxes (post-stock-based compensation expense), less taxes, plus depreciation and amortization, less capital expenditures and adjusted for changes in working capital. Includes estimated unlevered free cash flow with respect to the NPAC Contract of approximately $110 million for the last two quarters of 2017 and $208 million for 2018.

(5)     Includes estimated unlevered free cash flow for the last two quarters of 2017.

The financial projections also included the following information used by J.P. Morgan in its financial analysis, which information is not reflected in the table above: (a) estimated annual benefit to the Company of the previously announced spin-off of approximately $10 million (approximately $7 million on a tax-adjusted basis); (b) estimated restructuring costs of approximately $15 million in 2018 (approximately $10 million on a tax-adjusted basis) and $10 million in 2019 (approximately $7 million on a tax-adjusted basis); (c) estimated standalone costs of approximately $35 million in 2017 (approximately $23 million on a tax-adjusted basis), $30 million in 2018 (approximately $20 million on a tax-adjusted basis) and $5 million in each of 2019 and 2020 (approximately $3 million on a

tax-adjusted basis); (d) projected net debt at an assumed transaction closing date of June 30, 2017 of approximately $583 million (including estimated breakage and refinancing costs); and (e) estimated separation transaction fees of approximately $20 million.

**Materially Incomplete and Misleading Disclosures Concerning the Financial <u>Analyses Performed by Neustar's Financial Advisor</u>**

69.     The Proxy contains J.P. Morgan's written fairness opinion, and describes the various valuation analyses J.P. Morgan performed in support of its opinion.  However, the description of J.P. Morgan's opinion and analyses fails to include key inputs and assumptions underlying the analyses.  Without this information, as described below, Neustar's public stockholders are unable to fully understand the analyses and, thus, are unable to determine what weight, if any, to place on their fairness opinion rendered in support of the Proposed Transaction.

70.     With respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the Proxy fails to disclose:  (i) the range of terminal values for the Company at the end of fiscal year 2025; (ii) the unlevered free cash flows, methodology, inputs, and calculated range of terminal values for the information services businesses of the Company ("ISXCo") and the Number Portability Administration Center (both U.S. and Canada), order management solutions, and local number portability businesses of the Company ("OSSCo"); (iii) the expected unlevered free cash flows under the regional contracts between Neustar and North American Portability Management LLC under which Neustar provides Local Number Portability Administrator services in the United States (collectively, the "NPAC Contract"); (iv) J.P. Morgan's basis for applying perpetual revenue growth rates ranging from 1.5% to 2.5%; and (v) the inputs and assumptions underlying the weighted average cost of capital analysis of the Company in respect of ISXCo, OSSCo (excluding the NPAC Contract), and the NPAC Contract.

71.     With respect to J.P. Morgan's *Selected Publicly Traded Companies Analysis*, the

Proxy fails to disclose the individual multiples for the companies observed by J.P. Morgan in its analysis, any benchmarking analyses J.P Morgan performed for Neustar in relation to the selected public companies, and the specific companies which were included in each of the five groupings utilized by J.P. Morgan.

72.     With respect to J.P. Morgan's *Precedent Transaction Multiples Analysis*, the Proxy fails to disclose the individual multiples for the transactions observed by J.P. Morgan in its analysis, any benchmarking analyses J.P Morgan performed, and the specific transactions that were included in each of the groupings utilized by J.P. Morgan.

54.     The omission of this information renders the following statements in the Proxy false and/or materially misleading in contravention of the Exchange Act:

(a)     From pages 41-42 of the Proxy:

***Discounted Cash Flow Analysis***

J.P. Morgan conducted a discounted cash flow analysis for the Company for the purpose of determining an implied fully diluted equity value per share for common stock on a stand-alone basis. A discounted cash flow analysis is a method of evaluating an asset using estimates of the future unlevered free cash flows generated by the asset and taking into consideration the time value of money with respect to those future cash flows by calculating their "present value." For purposes of the J.P. Morgan opinion, "unlevered free cash flows" were calculated by taking the tax-affected earnings before interest, adding back depreciation and amortization, subtracting capital expenditures and adjusting for changes in working capital. For purposes of the J.P. Morgan opinion, "present value" refers to the current value of one or more future unlevered free cash flows from the asset, which is referred to as that asset's cash flows, and is obtained by discounting those cash flows back to the present using a discount rate that takes into account macroeconomic assumptions and estimates of risk, the opportunity cost of capital, capitalized returns and other appropriate factors. For purposes of the J.P. Morgan opinion, "terminal value" refers to the capitalized value of all cash flows from an asset for periods beyond the final forecast period.

J.P. Morgan calculated the unlevered free cash flows that the Company is expected to generate for the last two quarters of fiscal year 2017 through fiscal year 2025 using the Company management estimates. J.P. Morgan also calculated a range of terminal values for the Company at the end of fiscal year 2025 by applying perpetual revenue growth rates ranging from 1.5% to 2.5%. The

unlevered free cash flows and range of terminal values for ISXCo and OSSCo, along with the benefit to the Company from the previously announced separation and certain restructuring and standalone costs that were provided in the Company management estimates, were then discounted to present value as of June 30, 2017 using a range of discount rates from 10.0% to 11.0%. The expected unlevered free cash flows under the NPAC Contract were discounted to present value as of June 30, 2017 using a range of discount rates from 7.0% to 8.0%. J.P. Morgan chose the aforementioned discount rates based upon an analysis of the weighted average cost of capital of the Company in respect of ISXCo, OSSCo (excluding the NPAC Contract), and the NPAC Contract.

The implied range of the Company equity values was calculated by summing the present values mentioned above with the estimated cash and cash equivalents and subtracting the estimated debt balance as of June 30, 2017, and subtracting the estimated separation transaction fees, as provided in the Company management estimates. The range of implied equity values per share for common stock was calculated based on the number of fully diluted shares of common stock on December 12, 2016.

The implied valuation ranges of common stock that J.P. Morgan derived from those analyses (rounded to the nearest $0.50), as compared to the per share merger consideration of $33.50, is set forth below:

| Discounted Cash Flow | Implied Valuation Range for Neustar Common Stock |
|---|---|
| Company management estimates | $       30.50 to $37.50 |

(b)     From pages 38-39 of the Proxy:

### Selected Publicly Traded Companies

J.P. Morgan compared selected financial and operating data of the Company with similar publicly available data for selected publicly traded companies engaged in businesses which J.P. Morgan considered to be relevant to the Company's business. The companies selected by J.P. Morgan were as follows:

IHS Markit Ltd.;

Nielsen Holdings plc;

Verisk Analytics, Inc.;

Akamai Technologies, Inc.;

VeriSign, Inc.;

Gartner, Inc.;

FactSet Research Systems Inc.;

CoStar Group, Inc.;

TransUnion;

The Dun & Bradstreet Corporation;

CoreLogic, Inc.;

Acxiom Corporation;

Experian plc;

Aimia, Inc.;

F5 Networks, Inc.;

NetScout Systems, Inc.;

Amdocs Limited;

Synchronoss Technologies, Inc.;

CSG Systems International, Inc.;

Comptel Oyj; and

RedKnee Solutions Inc.

These companies were selected by J.P. Morgan, among other reasons, because they may be considered similar, for purposes of these analyses, to the Company because they compete primarily in a sector with competitive dynamics and growth potential similar to that of the Company. None of the selected companies is identical or directly comparable to the Company and certain of these companies may have financial and operating characteristics that are materially different from that of the Company. Accordingly, a complete analysis of the results of the calculations described below cannot be limited to a quantitative review of such results and involves complex considerations and judgments concerning the differences in the financial and operating characteristics of the selected companies compared to the Company's, and other factors that could affect the public trading value of the selected companies and the Company.

In all instances, multiples were calculated using the closing stock prices on December 12, 2016. For each of the following analyses performed by J.P. Morgan, estimated financial data for the selected companies were obtained from the selected companies' filings with the SEC and certain publicly available Wall Street research analysts' estimates for calendar year 2017 selected by J.P. Morgan.

For each selected company, J.P. Morgan reviewed, among other information, the particular company's firm value ("FV"), calculated as the market value of the particular company's common equity, plus total debt, plus non-controlling interest, less cash and cash equivalents, compared to the expected earnings before

interest, taxes, depreciation, and amortization ("EBITDA") for calendar year 2017 ("CY2017 Estimated EBITDA") to determine a range of multiples of the ratio of FV/CY2017 Estimated EBITDA for the selected companies. The multiples for FV/CY2017 Estimated EBITDA for the selected companies ranged from a low of 6.0x to a high of 20.9x.

J.P. Morgan focused its review and analysis of the appropriate valuation ranges of FV/CY2017 Estimated EBITDA to apply with respect to the Company on five groupings of the companies listed above: those whose businesses were similar to ISXCo; those focused on marketing services; those focused on security services; those focused on data services; and those whose businesses were similar to OSSCo. The mean and median multiples for these groups were 13.1x and 13.1x, 11.2x and 11.7x, 10.6x and 10.5x, 9.8x and 9.9x, and 10.4x and 10.6x, respectively.

J.P. Morgan also reviewed and considered similar FV/EBITDA multiples of the Company published by certain equity research analysts after the announcement of the proposed spin-off by the Company. J.P. Morgan focused on the calendar year 2018 estimated EBITDA ("CY2018 Estimated EBITDA") published by the equity research analysts as a proxy for ISXCo because the CY2018 Estimated EBITDA does not take into account the NPAC Contract, which the equity research analysts assumed would expire during calendar year 2017 for purposes of their reports. The FV/CY2018 Estimated EBITDA multiples published by the equity research analysts ranged from 7.0x to 10.0x.

J.P. Morgan calculated the fully distributed FV for ISXCo by applying a FV/CY2017 Estimated EBITDA range of 8.0x to 10.0x (selected by J.P. Morgan based on the multiples of the selected companies and the comparable growth rates, free cash flow metrics, scale, and competitive positioning of the selected companies, as well as the multiples of the Company published by equity research analysts) to the estimated next twelve month ("NTM") EBITDA of ISXCo, inclusive of the benefit to the Company from the previously announced separation, for the period beginning June 30, 2017 provided in the Company management estimates.

J.P. Morgan calculated the fully distributed FV for OSSCo (excluding the NPAC Contract) by applying a FV/CY2017 Estimated EBITDA of 8.5x (selected by J.P. Morgan based on the multiples of the selected companies and the comparable growth rates, free cash flow metrics, scale, and competitive positioning of the selected companies) to the estimated NTM EBITDA of OSSCo (excluding the NPAC Contract) for the period beginning June 30, 2017 provided in the Company management estimates.

J.P. Morgan calculated the net present value of the cash flows from the NPAC Contract for the period from June 30, 2017 to September 30, 2018, as provided in the Company management estimates, using a range of discount rates from 7.0% to 8.0%. J.P. Morgan calculated the net present values of certain restructuring and standalone costs, each of which was provided in the Company management estimates, using a range of discount rates from 10.0% to 11.0%. J.P. Morgan

chose the aforementioned discount rates based upon an analysis of the weighted average cost of capital of the Company in respect of ISXCo, OSSCo (excluding the NPAC Contract), and the NPAC Contract.

J.P. Morgan calculated a range for the Company's equity value by summing (a) the ISXCo fully distributed FV, (b) the OSSCo fully distributed FV (excluding the NPAC Contract), (c) the net present value of the NPAC Contract for the period from June 30, 2017 to September 30, 2018, (d) the projected net debt at an assumed transaction closing date of June 30, 2017 (including estimated breakage and refinancing costs), as provided in the Company management estimates, and (e) the estimated separation transaction fees, as provided in the Company management estimates, and subtracting the net present values of the aforementioned restructuring and standalone costs. J.P. Morgan then calculated a range for the implied per share equity value of the common stock based on the number of fully diluted shares of common stock on December 12, 2016.

The results of those analyses are set forth in the chart below (rounded to the nearest $0.50), as compared to the per share merger consideration of $33.50:

| Trading Multiple | Implied Valuation Range for Neustar Common Stock |
|---|---|
| FV/CY2017 Estimated EBITDA | $29.50 to $37.00 |

(c)     From pages 40-41 of the Proxy:

### Precedent Transaction Multiples Analysis

Using certain publicly available information, J.P. Morgan examined the following selected transactions involving companies engaged in businesses which J.P. Morgan considered to be relevant to the Company's business. J.P. Morgan focused on transactions announced after January 1, 2010 because these transactions were executed in an economic environment and in capital market conditions similar to those existing at the time the merger agreement was executed. For each of the selected transactions, J.P. Morgan calculated and, to the extent information was publicly available, compared the target's FV implied by the transaction as a multiple of the target's EBITDA for the latest publicly available twelve-month period immediately preceding the announcement of the transaction ("LTM Estimated EBITDA").

| Acquiror | Target | Announcement Date |
|---|---|---|
| Onex Corporation / Baring Private Equity Asia | Intellectual Property & Science business of Thomson Reuters Corporation | 07/11/16 |
| IMS Health Holdings, Inc. | Quintiles Transnational Holdings Inc. | 05/03/16 |
| IHS Inc. | Markit Ltd. | 03/21/16 |
| International Business Machines Corporation | Truven Health Analytics, Inc. | 02/18/16 |
| Intercontinental Exchange, Inc. | Interactive Data Corporation | 10/26/15 |

| | | |
|---|---|---|
| Vista Equity Partners | Solera Holdings, Inc. | 09/13/15 |
| McGraw Hill Financial, Inc. | SNL Financial LC | 07/27/15 |
| Verisk Analytics, Inc. | Wood Mackenzie Limited | 03/10/15 |
| Carlyle Investment Management LLC | Dealogic (Holdings) plc | 11/05/14 |
| Alliance Data Systems Corporation | Conversant, Inc. | 09/11/14 |
| The Blackstone Group J.P. / Goldman Sachs Merchant Banking Division | Ipreo Holdings LLC | 04/14/14 |
| Berkshire Partners LLC | Catalina | 03/03/14 |
| GTCR LLC | Callcredit Information Group Limited | 02/17/14 |
| Harland Clarke Holdings Corp. | Valassis Communications, Inc. | 12/18/13 |
| IHS Inc. | R.L. Polk & Co. | 06/10/13 |
| Nielsen Holdings N.V. | Arbitron Inc. | 12/18/12 |
| Leonard Green & Partners, L.P. | CCC Info Services Inc. | 11/30/12 |
| Advent International Corporation / Goldman Sachs Capital Partners | TransUnion Corp. | 02/17/12 |
| Bloomberg Inc. | The Bureau of National Affairs, Inc. | 08/25/11 |
| TPG Capital | Property Information business of MacDonald, Dettwiler and Associates Ltd | 11/05/10 |
| Silver Lake Technology Management, L.L.C. / Warburg Pincus LLC | Interactive Data Corporation | 05/04/10 |
| Madison Dearborn Partners, LLC | TransUnion Corp. | 04/29/10 |
| CCMP Capital Advisors, LLC | infoGROUP Inc. | 03/08/10 |
| MSCI Inc | RiskMetrics Groups, Inc. | 03/01/10 |

The multiples for FV/LTM Estimated EBITDA for the selected transactions ranged from a low of 6.9x to a high of 16.9x and had a mean of 12.3x and a median of 12.8x.

J.P. Morgan calculated the fully distributed FV for ISXCo by applying a FV/LTM Estimated EBITDA range of 11.0x to 13.0x (selected by J.P. Morgan based on the multiples of the selected transactions) to the EBITDA of ISXCo for calendar year 2016 provided in the Company management estimates.

J.P. Morgan calculated the fully distributed FV of OSSCo (excluding the NPAC Contract) by applying a FV/LTM Estimated EBITDA of 8.5x (selected by J.P. Morgan based on the multiples of the selected companies and the comparable growth rates, free cash flow metrics, scale, and competitive positioning of the selected companies) to the EBITDA of OSSCo (excluding the NPAC Contract) for calendar year 2016 provided in the Company management estimates.

J.P. Morgan calculated the net present value of the cash flows from the NPAC Contract for the period from June 30, 2017 to September 30, 2018, as provided in the Company management estimates, using a range of discount rates from 7.0% to

8.0%. J.P. Morgan calculated the net present values of certain restructuring and standalone costs, each of which was provided in the Company management estimates, using a range of discount rates from 10.0% to 11.0%. J.P. Morgan chose the aforementioned discount rates based upon an analysis of the weighted average cost of capital of the Company in respect of ISXCo, OSSCo (excluding the NPAC Contract), and the NPAC Contract. J.P. Morgan's precedent transaction multiples analysis also assumed buyer interest in the Company as a whole (and so did not take into account the benefit to the Company from the previously announced separation) and that any such buyer would not apply any conglomerate discount to its valuation of the Company.

J.P. Morgan calculated a range for the Company's equity value by summing (a) the ISXCo fully distributed FV, (b) the OSSCo fully distributed FV (excluding the NPAC Contract), (c) the net present value of the NPAC Contract for the period from June 30, 2017 to September 30, 2018, (d) the projected net debt at an assumed transaction closing date of June 30, 2017 (including estimated breakage and refinancing costs), as provided in the Company management estimates, and (e) the estimated separation transaction fees, as provided in the Company management estimates, and subtracting the net present values of the aforementioned restructuring and standalone costs. J.P. Morgan then calculated a range for the implied per share equity value of the common stock based on the number of fully diluted shares of common stock on December 12, 2016.

The results of those analyses are set forth in the chart below (rounded to the nearest $0.50), as compared to the per share merger consideration of $33.50:

| Precedent Transaction Multiple | Implied Valuation Range for Neustar Common Stock |
|---|---|
| FV/LTM Estimated EBITDA | $29.00 to $34.50 |

## Materially Incomplete and Misleading Disclosures Concerning the Background of the Proposed Transaction

73.     The Proxy omits the following material information concerning the background of the Proposed Transaction and the sales process.

74.     First, the Proxy fails to disclose the timing and nature of all communications regarding future employment and/or directorship of Neustar's officers and directors, including who participated in all such communications.

75.     The Proxy also fails to disclose the nature of the "prior discussions with Party A regarding [the C]ompany in early 2016."

22

76.     Finally, the Proxy fails to disclose the nature of the "prior discussions with Party C [and Party D] regarding a potential investment in [the C]ompany in 2015."

77.     The omission of this information renders the following statements in the Proxy false and/or materially misleading in contravention of the Exchange Act:

(a)     From page 22 of the Proxy:

On July 16, 2016, we entered into a confidentiality agreement with Party B, which agreement included customary non-disclosure and standstill provisions that allow Party B to make confidential proposals to us at any time. We had an existing confidentiality agreement with Party A as a result of prior discussions with Party A regarding our company in early 2016. Also, we had an existing confidentiality agreement with Party C as a result of prior discussions with Party C regarding a potential investment in our company in 2015. The confidentiality agreements with Party A and Party C had similar non-disclosure and standstill provisions as those included in the confidentiality agreement with Party B, including providing Party A and Party C with the ability to make confidential proposals to us at any time.

78.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

## COUNT I

**Against All Defendants for Violations of Section 14(a) of the
Exchange Act and Rule 14a-9 Promulgated Thereunder**

79.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

80.     During the relevant period, defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

81.     By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy.  The Proxy was

prepared, reviewed, and/or disseminated by the defendants.  It misrepresented and/or omitted material facts, including material information about the sales process for the Company, the financial analyses performed by the Company's financial advisors, and the actual intrinsic standalone value of the Company.  The defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

82.     The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction.

83.     By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

84.     Because of the false and misleading statements in the Proxy, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

85.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

86.     The Individual Defendants acted as controlling persons of Neustar within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Neustar and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the

various statements which Plaintiff contends are false and misleading.

87.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

88.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of this document.

89.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.   The Proxy purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the directors.

90.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

91.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' conduct, Neustar's stockholders will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief, in its favor and in favor of the Class and against defendants as follows:

A.      Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.      Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until defendants disclose and disseminate the material information identified above to Neustar stockholders;

C.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

D.      Declaring that defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as SEC Rule 14a-9 promulgated thereunder;

E.      Awarding Plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: February 1, 2017                    **RIGRODSKY & LONG, P.A.**

                                        By:   */s/ Brian D. Long*
                                           Brian D. Long (#4347)
                                           Gina M. Serra (#5387)
                                           2 Righter Parkway, Suite 120
                                           Wilmington, DE 19803
                                           (302) 295-5310

                                           *Attorneys for Plaintiff*

**OF COUNSEL:**

**WEISSLAW LLP**
Richard A. Acocelli
Michael A. Rogovin
Kelly C. Keenan
1500 Broadway, 16th Floor
New York, New York 10036
Tel.: (212) 682-3025
Fax: (212) 682-3010